# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | |
|---|---|
| CLINTON YOUNG, | |
| *Plaintiff,* | Civil Action No. 7:23-cv-146-DC |
| v. | |
| MIDLAND COUNTY, TEXAS; WELDON "RALPH" PETTY, JR., sued in his individual capacity; ALBERT SCHORRE, JR., sued in his individual capacity; and TERESA CLINGMAN, sued in her individual capacity, | **Corrected Complaint and Jury Demand** |
| *Defendants.* | |

## CORRECTED COMPLAINT FOR DECLARATORY AND RETROSPECTIVE RELIEF

Plaintiff Clinton Young ("Mr. Young") hereby sues Midland County, Texas ("Midland County" or the "County"), Weldon "Ralph" Petty, Jr. ("Petty"), Albert Schorre, Jr. ("Schorre"), and Teresa Clingman ("Clingman") (collectively, the "Defendants") for their deprivation of Mr. Young's rights under the Fourteenth Amendment to the United States Constitution.

## Introduction

1.      Perhaps the most fundamental tenet of the U.S. judicial system is that a person shall not be deprived of life or liberty without due process of law.  At its core, this imperative demands "[a] fair trial in a fair tribunal," *In re Murchison*, 349 U.S. 133, 136 (1955), which requires impartial judges and impartial proceedings.

2.      For nearly twenty years, Midland County and its prosecutors flagrantly ignored this chief command.  From 2001 to 2019, Midland County employed Ralph Petty as an Assistant District Attorney by day and a law clerk to Midland County's judges by night.  For two decades, Petty served as judges' right-hand advisor, engaging in *ex parte* communications and surreptitiously drafting opinions and orders in the prosecution's favor.

3.      For Plaintiff Clinton Young, this nefarious double-dipping nearly cost him his life and did cost him twenty undeserved years on death row and, in turn, in solitary confinement.

4.      Mr. Young was just eight days away from being executed by the State of Texas when the Texas Court of Criminal Appeals stayed his execution.  But for the eleventh-hour revelation of the structural error that tainted his criminal proceedings, Mr. Young would be dead at the hands of the government.

5.      This lawsuit is now filed to vindicate Mr. Young's rights and the most essential principles of our Constitution.

<u>**Jurisdiction and Venue**</u>

6.      This is a civil rights suit brought under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983.

7.     Mr. Young seeks declaratory relief and compensatory and punitive damages.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

8.     Venue is proper in this Court under 28 U.S.C. § 1391.

### The Parties

9.     Plaintiff Clinton Young is a citizen of the United States and a current resident of Marion County, Texas.  His constitutional right to due process was violated when Petty worked as a law clerk to the judges adjudicating his criminal case, including at trial and during habeas proceedings.

10.     Defendant Midland County is a Texas County Government located at 500 N. Loraine Street, Midland, Texas 79701.  Midland County's policymakers knew about and expressly endorsed Petty's dual role as a prosecutor and a law clerk to the same judges he practiced before for nearly two decades, creating an official policy or custom.

11.     Defendant Weldon "Ralph" Petty is a former Assistant District Attorney ("ADA") for Midland County, Texas.  His address is 2522 Quail Point, Midland, Texas 79705.  He served as an ADA from 2001–2019.  During this same period, Petty was also a law clerk to various State District Court Judges for Midland County ("District Judges"), including Judge Hyde, who adjudicated Mr. Young's criminal trial and numerous habeas proceedings, and Judge Robert Moore, who presided over many of Mr. Young's habeas proceedings.

12.     Defendant Schorre is a former District Attorney ("DA") for Midland County.  His address is 3520 Kenyon Dr., Fort Collins, Colorado 80549.  In 2001, while DA, Schorre hired Petty as an ADA.  Schorre hired Petty knowing Petty would have a dual role as a prosecutor and a law clerk to the judges he would be practicing before.  Schorre was also one of the lead prosecutors on Mr. Young's criminal trial and staffed Petty as a prosecutor on the case while knowing about Petty's employment with the District Judges.  Schorre never disclosed Petty's dual role to Mr. Young or his counsel.

13.     Defendant Clingman is a former DA and former First ADA for Midland County.  Her address is 1606 Pecan Avenue, Midland, Texas 79705.  While First ADA, Clingman was one of the lead prosecutors on Mr. Young's criminal trial and staffed Petty as a prosecutor on the case, knowing about Petty's employment with the District Judges.  While DA, Clingman assigned Petty to represent the government against Mr. Young's habeas petitions, knowing about Petty's employment with the District Judges.  She never disclosed Petty's dual role to Mr. Young or his counsel.

<u>**Factual Allegations**</u>

**Mr. Young is convicted of a crime he did not commit, damning him to Texas's infamous death row.**

1.     Clinton Lee Young was born in Mount Pleasant, Texas on July 19, 1983, and spent his childhood playing in the streets of Jefferson, Texas.

2.     Missing paternal guidance as a child, Mr. Young's teenage years included friendships that led Mr. Young astray and into trouble.

3.     When Mr. Young was just seventeen, he began spending time with friends of his older brother, nine years his senior, who were involved in drugs and exposed Mr. Young to people and places that did not serve Mr. Young.

4.     Because of these relationships, Mr. Young, just four months past his eighteenth birthday, found himself in a dangerous situation that ultimately resulted in an acquaintance of Mr. Young's killing two individuals—Doyle Douglas and Samuel Petrey.

5.     To escape criminal charges, the acquaintance, David Page, falsely accused Mr. Young of the two murders, and on February 12, 2002, Mr. Young was re-arraigned in the 385th Judicial District Court before the Honorable Judge G. Hyde for the murders of Doyle Douglas and Samuel Petrey.  Judge Hyde presided over Mr. Young's entire case, including pre-trial proceedings, the trial, and Mr. Young's motion for new trial.  Judge Hyde also presided over many of Mr. Young's postconviction habeas proceedings.

6.     Mr. Young's criminal case was prosecuted by the Midland County District Attorney's Office.  DA Schorre and First ADA Clingman were the lead prosecutors against Mr. Young.  In their role as lead prosecutors, Schorre and Clingman also assigned ADA Petty to the prosecution, giving him responsibility for, among other things, preparing the government's motions throughout the criminal proceedings and advising the prosecution team on legal strategy and arguments.

7.      Mr. Young entered a plea of "not guilty" at the time of re-arraignment, and he maintained that plea throughout all related proceedings.  He has always maintained— and today maintains—that he did not murder Mr. Douglas or Mr. Petrey.

8.      To the contrary, all evidence points to the acquaintance, David Page, an older member of Mr. Young's friend group who was present at both murders, as the murderer.

9.      Despite the accurate and verifiable information on the most fundamental aspects of the killings of Mr. Douglas and Mr. Petrey reflecting Page as the murderer, it was Page who was offered a plea deal of thirty years' imprisonment in exchange for testifying against Mr. Young at trial.  Page took the deal.

10.     By Page's own account, he believed that providing incriminating testimony against Mr. Young could secure him a better deal from the District Attorney's Office.

11.     Due in large part to the testimony Page provided at trial, the jury found Mr. Young guilty of causing the deaths of Mr. Douglas and Mr. Petrey and convicted him of capital murder.

12.     Mr. Young continued to maintain that he was innocent of the charges.

13.     On April 14, 2003, Judge Hyde entered a Judgment of Capital Murder and Sentence of Death against Mr. Young.

14.     A true and correct copy of the judgement is attached as Exhibit A.

15.     Mr. Young was also ordered to pay Midland County for the costs of his prosecution which, at the time of his initial sentencing, amounted to $172,422.03.

16.     Judge Hyde overruled Mr. Young's motion for a new trial on June 20, 2003.

17.     A true and correct copy of this order is attached as Exhibit B.

18.     That same day, Mr. Young was remanded to Texas's death row, housed at the Texas Department of Criminal Justice's infamous Polunsky Unit, to await his execution.

**Mr. Young indefatigably pursued appeals and habeas relief from his wrongful conviction while Petty and Midland County pursued his death.**

19.     On direct appeal, the Texas Court of Criminal Appeals ("CCA") affirmed Mr. Young's conviction on September 28, 2005.

20.     On April 22, 2005, Mr. Young, through counsel, filed his initial postconviction application for a writ of habeas corpus, raising fourteen grounds for review.

21.     The District Attorney's Office assigned Petty to lead the State's opposition to Mr. Young's habeas proceedings.

22.     On July 20, 2005, Mr. Young wrote to the trial court raising additional claims that he had asked his habeas counsel to raise in his initial application, but which counsel did not include.

23.     The State opposed Mr. Young's initial application.  The State's opposition was authored and signed by Petty and Schorre.

24.     On August 15, 2005, Mr. Young again wrote to Judge Hyde, claiming that his trial counsel was ineffective for failing to introduce evidence of Page's culpability in the murders.

25.     Mr. Young was eventually appointed new postconviction counsel.  In a letter dated September 2, 2005, Judge Hyde informed Mr. Young's new counsel that "Mr. Ralph Petty of the Midland County District Attorney's Office represents the State in this proceeding."

26.     A true and correct copy of this letter is attached as Exhibit C.

27.     Mr. Young filed pleadings in January, March, and June 2006 raising additional grounds for relief.

28.     Among other issues raised, Mr. Young informed the court that the private investigator responsible for mitigation research, Lisa Milstein, had heavily abused drugs while working on Mr. Young's case and falsified affidavits.  When subpoenaed to testify at the evidentiary hearing concerning Mr. Young's habeas application, Milstein informed Mr. Young's counsel that she would invoke her Fifth Amendment right against self-incrimination and would not testify unless guaranteed use-immunity by the government. Midland County, through Petty, refused Milstein's request for use immunity. So, she did not testify.

29.     On June 26, 2006, Judge Hyde adopted the State's suggested summary of trial evidence and denied Mr. Young's initial application for postconviction relief.

30.     On December 20, 2006, the CCA adopted Judge Hyde's findings and conclusions and denied Mr. Young relief; it also considered Mr. Young's later-raised claims to be his first subsequent writ application and denied them as an abuse of the writ.

31.     Mr. Young filed his second subsequent habeas application in March 2009, raising four claims.

32.     The trial court determined that, because the application was a subsequent application for writ of habeas corpus, Texas law precluded it from taking action on the pleading until the CCA issued an order as to whether the subsequent application satisfied Article 11.071, § 5.

33.     The CCA determined that two of Mr. Young's claims did satisfy Article 11.071, § 5 and remanded the matter back to the trial court.  Specifically, the CCA found merit to Mr. Young's claims that:

   a.  The prosecution's failure to produce exculpatory evidence, and the presentation of false testimony, violated applicant's rights.

   b.  The prosecution's suppression of evidence concerning State witness A.P. Merillat violated applicant's constitutional rights.

34.     The State opposed Mr. Young's second subsequent application.  The State's opposition was authored and signed by Petty and Clingman.

35.     The Honorable Robert. H. Moore was assigned to Mr. Young's second subsequent application.

36.     Following evidentiary hearings, Judge Moore denied Mr. Young's application on May 18, 2011.  Specifically, he concluded that the previously undisclosed plea agreement between Schorre and Page and another witness did not amount to reversible error because, in Judge Moore's view, no rational juror would believe Page's testimony was falsely fashioned to assist the State to secure a benefit from the State.  Judge Moore also concluded that there was no evidence that Page or the other witness provided false testimony at trial.

37.     Relying on Judge Moore's findings and conclusions, the CCA denied Mr. Young's second subsequent application on June 20, 2012.

38.     Over the next few years, Mr. Young continued to pursue proof that he did not murder Mr. Douglas or Mr. Petrey, including by seeking gunshot residue testing of the gloves found at the scene of Mr. Petrey's murder and ballistics analyses.

39.     On May 1, 2017, the State filed a Motion for Court's Order for Execution of Defendant and Issuance of Warrant of Execution.

40.     A true and correct copy of this motion is attached as Exhibit D.

41.     On June 5, 2017, Judge Moore ordered that Mr. Young be executed on October 26, 2017 by "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death into the body of the said **CLINTON LEE YOUNG** until he is dead." (emphasis in original).

42.     A true and correct copy of this order is attached as Exhibit E.

43.     Mr. Young moved to modify or withdraw the execution date, and a hearing was set for October 16, 2017.

44.     On September 29, 2017, twenty-seven days before his planned execution, Mr. Young filed his third subsequent application for a writ of habeas corpus.

45.     In this application, Mr. Young presented evidence demonstrating that, as Mr. Young had consistently claimed, the person who shot Mr. Petrey was wearing gloves at the time he pulled the trigger.  The evidence also revealed only one set of DNA inside the gloves found at the scene of Mr. Petrey's murder: David Page's.

46.     The third subsequent application also provided evidence concerning Page's repeated confessions to Mr. Petrey's murder:

> a.  Between late 2001 and early 2003, before Mr. Young's case ever went to trial, Page told a fellow prisoner that no one would be able to prove he murdered Mr. Petrey because he was wearing gloves.
>
> b.  Between late 2001 and early 2003, before Mr. Young's case ever went to trial, a fellow prisoner overheard Page confess that he, not Mr. Young, murdered Mr. Petrey and that blaming Mr. Young would save him from a life sentence.
>
> c.  In 2010, seven years after Mr. Young was sentenced to death, a fellow prisoner overheard Page brag that he had shot a man twice in the head and

that he got a good deal because another person was on death row for the crime.

    d.  In 2010, seven years after Mr. Young was sentenced to death, another prisoner overheard Page describe the shooting of Mr. Petrey, brag that police never found fingerprints because he had worn gloves, and express that he felt lucky for his thirty-year sentence because, if police knew the truth, he would be facing capital murder.

47.    On October 3, 2017, Judge Moore ordered that the application should be referred to the CCA to determine whether Mr. Young had satisfied Article 11.071, § 5.

48.    That same day, Mr. Young's counsel learned through an online news article that Page was scheduled to testify at the hearing regarding Mr. Young's execution date and that Midland County granted Page use-immunity for the hearing.

49.    Without Mr. Young or his counsel's knowledge, Petty had moved Judge Moore for orders granting use-immunity to Page and appointing Page counsel for purposes of taking his testimony at the hearing.

50.    Judge Moore inexplicably granted both motions two days before they were even formally filed.

51.    Mr. Young's counsel was not served with either the motions or the orders granting the motions.

52.     After learning of these back-door dealings between Judge Moore and Petty, Mr. Young's counsel moved to rescind the hearing because Texas law prohibited Judge Moore from hearing witness testimony or engaging in any factfinding before the CCA authorized the claims Mr. Young raised in his third subsequent application.

53.     The hearing with Page as a witness did not take place, but Page had already been transferred to the Midland County jail based on a bench warrant that current Midland County DA Laura Nodolf had obtained without Mr. Young's or his counsel's knowledge.

54.     On October 4, 2017, DA Nodolf interviewed Page, at which time Page admitted that: (1) he, not Mr. Young, kidnapped Mr. Petrey at gunpoint; (2) Mr. Young never suggested slitting Mr. Petrey's throat, contrary to his earlier testimony; and (3) he provided false testimony at Mr. Young's trial when he denied purchasing gloves hours before Mr. Petrey was shot.

55.     Neither Petty nor DA Nodolf informed anyone, including Mr. Young's counsel, of this exculpatory evidence.

56.     Petty represented the State at a telephonic hearing on Mr. Young's case the day after the interview, yet he still did not disclose the exculpatory evidence provided during Page's interview.

57.     On October 17, 2017, the District Attorney's Office, through Petty, filed its response to Mr. Young's writ application, without making any disclosure of the

exculpatory information obtained in the interview of Mr. Page.  Instead, the State argued—in direct contravention of the information they had just obtained from Page—that his testimony at trial had been entirely truthful.

58.     Even without this exculpatory evidence, on October 18, 2017, eight days before Mr. Young's execution, the CCA found that Mr. Young's claim concerning the importance of Page's allegedly false testimony satisfied Article 11.071, § 5, remanded his application to the trial court, and stayed Mr. Young's execution.

59.     Mr. Young would not be killed on October 26, 2017.

60.     Petty ceased working on Mr. Young's case on or around October 17, 2017.

61.     It was not until after Petty was replaced by ADA Eric Kalenak that the exculpatory interview was finally disclosed.  On October 25, 2017, three weeks after the interview took place, ADA Kalenak emailed the taped interview to Mr. Young's counsel.

62.     Upon remand from the CCA, Judge Moore requested to be removed from Mr. Young's case, and the case was reassigned to the Honorable Brad Underwood.

63.     Judge Underwood was eventually replaced by the Honorable Sid L. Harle.

64.     While Mr. Young's third subsequent application was pending, new information came to light, revealing that Mr. Young's constitutional rights had been grossly violated and necessitating a fourth subsequent application for a writ of habeas corpus.

**The Defendants' unconstitutional conduct is finally revealed.**

65.     In August 2019, current Midland County DA Laura Nodolf disclosed to Mr. Young's counsel that, throughout the course of Mr. Young's criminal proceedings, ADA Ralph Petty was dually employed by Midland County: while working as a prosecutor for Midland County, Petty was simultaneously employed as a law clerk to District Judges.

66.     Further investigation of Petty's conflict of interest revealed that, in addition to having regular *ex parte* communications with District Judges on cases prosecuted by the District Attorney's Office, Petty surreptitiously drafted hundreds of orders and opinions for District Judges, resolving countless consequential disputes in the prosecution's (i.e., his employer's) favor.

67.     The investigation also revealed that Petty used a unique formatting and styling when drafting documents for District Judges. The styling employed by Petty was not used by the court or others in the District Attorney's Office. For instance, Petty used asterisks (*) in lieu of section symbols (§) on case captions and used a monospaced font:

```
                         NO. CR 27,181

THE STATE OF TEXAS              *          IN THE DISTRICT COURT
                                *
V.                              *      385TH JUDICIAL DISTRICT
                                *
CLINTON LEE YOUNG               *          MIDLAND COUNTY, TEXAS

              STATE'S MOTION FOR COURT'S ORDER
               FOR EXECUTION OF DEFENDANT AND
              ISSUANCE OF WARRANT OF EXECUTION
```

68.   After discovering Petty's conflict, DA Nodolf sent undated letters to many, but not all, of the defendants whose cases were affected by Petty's dual role.

69.   A true and correct copy of the letter sent to Mr. Young is attached as Exhibit F.

70.   In each letter, DA Nodolf acknowledged the conflict of interest and that the conflict potentially violated the rules of ethics:

> I am writing to tell you about some information we learned about the writ of habeas corpus you or your attorney filed in Midland County. Ralph Petty, an Assistant District Attorney, was the lawyer responsible for working on your case in our office. While he worked on your writ for this office, he was also paid by the District Judges of Midland County to work on your writ. The current District Attorney and staff were not aware Mr. Petty was being paid by the District Courts until after Mr. Petty had retired from the office. This is a potential violation of the rules of ethics for attorneys. If you have further questions about any impact this might have on your case, we suggest you consult with an attorney. The Midland County District Attorney's Office cannot provide legal advice to you, but we can provide documentation upon request.

71.   Mr. Young's case was perhaps the most egregious display of Petty straddling the judicial bench as both prosecutor and quasi-judge, and it is this conflict of interest—and flagrant due process violation—that formed the basis of Mr. Young's fourth subsequent application.

**ADA Petty spent his career working from both sides of the judicial bench, and he did so with the express endorsement and facilitation of Midland County.**

72.   The State of Texas granted Weldon "Ralph" Petty, Jr. a license to practice law in 1973.

73.     In March 2000, Midland County began paying Petty for legal work he performed for District Judges, including Judge Hyde and Judge Moore.

74.     While the State of Texas funds the base salary for District Judges, counties supplement that base salary and counties pay the operating costs of their district courts.

75.     Petty sent invoices for his work for the District Judges to the District Attorney's Office and to the District Courts of Midland County, Texas.   Payments for these invoices were processed through the Midland County Treasurer's Office.

76.     In early 2001, DA Schorre hired Petty as an ADA for Midland County, knowing that Petty was also employed by District Judges.

77.     On or about February 12, 2001, Petty signed an employment contract with the Midland County District Attorney's Office, which expressly noted that Petty "shall be permitted to continue the performance of legal services for the District Judges of Midland County, Texas and perform such work for the said District Judges as they shall desire and be paid for the same as ordered by the District Judges."

78.     A true and correct copy of Petty's February 12, 2001 employment contract is attached as Exhibit G.

79.     Petty continued to perform work for the District Judges as outlined above through 2018.

80.     At no point did Schorre or Petty disclose Petty's dual role to defendants or their counsel.  Nor did Schorre attempt to stop or prevent Petty from working as a law clerk for the District Judges.

81.     One of Petty's primary responsibilities for the District Attorney's Office was representing the prosecution in opposing defendants' applications for habeas relief.

82.     One of Petty's primary responsibilities for the District Judges was researching, advising, and preparing rulings in response to applications for habeas relief.

83.     In 2002, Judge Hyde asked Midland County Attorney Russel Malm "whether or not Mr. Petty could receive additional pay in addition to his district attorney salary for doing work for the District Judges on habeas corpus cases."

84.     County Attorney Malm responded on behalf of the County on August 14, 2002, deciding that Petty could "be paid for this additional work."

85.     A true and correct copy of County Attorney Malm's letter is attached as Exhibit H.

86.     In 2008, Midland County elaborated on Petty's dual role in response to an Internal Revenue Service ("IRS") audit that asked why Petty received both a W-2 and a Form 1099 from the County.

87.     At the time Petty was hired, Defendant Clingman was the First Assistant District Attorney, and she, like Schorre, knew about Petty's employment with the District Judges.

18

88.     By 2008, Clingman was the DA for Midland County.

89.     In 2008, the Internal Revenue Service ("IRS") noticed that Petty was receiving both W-2s and Form 1099s from the County, and it requested additional information about this oddity.  In response, Clingman explained that the County paid Petty for both his role as a prosecutor and his role as a law clerk to the District Judges. Clingman noted that when "a writ of habeas corpus is filed, post-conviction, [Petty] responds to it for the judges, at their discretion or assignment."  She did not disclose that Petty opposed those same habeas petitions on behalf of the prosecution, nor did she disclose that Petty performed work for District Judges in criminal trial proceedings.

90.     A true and correct copy of Clingman's response to the IRS is attached as Exhibit I.

91.     Clingman never disclosed Petty's conflict of interest to defendants or their counsel.

92.     While a significant portion of Petty's work as an ADA concerned representing the prosecution against defendants' habeas corpus petitions, Petty worked on cases at all stages of prosecution.  Petty also regularly advised fellow prosecutors on their cases, worked with them on case strategies, assisted with drafting key documents, and reviewed fellow prosecutors' drafts prior to filing.

93.     Petty was involved in almost every case prosecuted by the District Attorney's Office in some capacity, often as an advisor on prosecution strategies and arguments.

94.     While a significant portion of Petty's law clerk duties consisted of advising, researching, and drafting rulings on defendants' state habeas petitions, Petty also advised, performed legal research for, and wrote orders and opinions for District Judges at all stages of the criminal process.

95.     At times, District Judges would privately visit Petty in his office at the District Attorney's Office to seek his advice and opinions on cases.

96.     Fellow prosecutors, including DA Nodolf, observed these *ex parte* meetings, but did not report them to defendants or their counsel.

97.     Invoices reflect that Midland County paid Petty for performing law clerk duties for District Judges—while Midland County, through the District Attorney's Office, also paid him as a prosecutor—from 2001 to 2014 and in 2017 and 2018.

98.     Petty retired in 2019.

99.     In total, the County paid Petty more than $250,000 for his work as a law clerk.  These payments were in addition to the salary the County paid Petty as an ADA.

100.     During his career, Petty was both the lead prosecutor and the law clerk on more than 300 cases.

101.    In addition to the cases on which he was the lead prosecutor, Petty was also the law clerk on cases prosecuted by the District Attorney's Office (his full-time employer) where he was not the lead prosecutor or did not formally appear on behalf of the District Attorney's Office.

102.    Even in cases where Petty was not the lead prosecutor or did not formally appear on behalf of the District Attorney's Office, he acted as a law clerk on cases where his employer was one of the parties, all while advising prosecutors on almost every case.

103.    Both federal and state codes of ethics prohibit law clerks from working on cases where a former, current, or future employer is a party because doing so, at best, gives the appearance of impropriety and, at worst, sacrifices the law clerk's ability to act impartially.

104.    Petty's dual role and conflict of interest were not disclosed to the defendants impacted by this misconduct until after Petty retired in 2019.

105.    After this misconduct was revealed, Petty filed a "Motion for Acceptance of Resignation as Attorney and Counselor at Law in Lieu of Disciplinary Action" in the Supreme Court of Texas.   In April 2021, the Court found that Petty engaged in professional misconduct and concluded that his "resignation is in the best interest of the public, the profession and Weldon Ralph Petty, Jr."   It therefore canceled Petty's law license and prohibited from the practice of law in the State of Texas.

21

106.    A true and correct copy of the Supreme Court of Texas's decision is attached as Exhibit J.

**Mr. Young's fourth subsequent application for a writ of habeas corpus is granted.**

107.    After the revelation of this obvious and egregious conflict of interest, Mr. Young filed his fourth subsequent application on August 13, 2020, detailing the dual role that Petty played throughout his criminal proceedings.

108.    Invoices revealed that Petty was employed as a law clerk for Judge Hyde throughout Mr. Young's entire trial, on Mr. Young's case and others.

109.    From the time of Mr. Young's arraignment on February 12, 2002 through his motion for new trial on June 19, 2003, Petty was paid at least $7,200 for law clerk services he provided to Judge Hyde.

110.    At the same time Petty was performing this law-clerk work for Judge Hyde, Petty was appearing before Judge Hyde as a prosecutor against Mr. Young.

111.    Petty provided significant behind-the-scenes trial preparation and investigation assistance to his fellow prosecutors, described by his fellow prosecutors as "basically the legal advisor to [the] team that was prosecuting the case" and the one who "probably drafted just about every single motion in [Mr. Young's] case . . . that the prosecution filed."  He also physically appeared before the trial court as a representative of the State against Mr. Young.  For instance, Petty:

        a.  Examined witnesses at a January 2, 2003 pretrial hearing;

b.  Argued the State's Motion to Amend Indictment;

c.  Argued the State's proposed jury charge and opposed Mr. Young's counsel's objections to it; and

d.  Examined witnesses at the hearing on Mr. Young's motion for new trial.

112.  The record in Mr. Young's case is littered with Petty's distinctive styling and formatting, both on documents on behalf of the State and documents purportedly drafted by the trial court.

113.  Petty's conflict did not end with Mr. Young's criminal trial.

114.  As noted, Petty was the prosecutor assigned to represent the State and defend Mr. Young's conviction during Mr. Young's initial and first subsequent applications for habeas relief before Judge Hyde.

115.  In this role, Petty authored the State's pleadings opposing Mr. Young's application and personally appeared in court on behalf of the State.

116.  At the same time, Petty was Judge Hyde's right-hand counselor, surreptitiously advising Judge Hyde on how to rule on Mr. Young's habeas petitions and drafting Judge Hyde's orders denying those petitions.

117.  While some invoices have been reportedly lost, one reveals that Petty received at least $1,500 from Judge Hyde—paid through Midland County—for his work on Mr. Young's case.

118.  A true and correct copy of this invoice is attached as Exhibit K.

119.   Petty was also the prosecutor assigned to represent the State and defend Mr. Young's conviction during Mr. Young's second subsequent application for habeas relief before Judge Moore.

120.   In this role, Petty, among other things, represented the State at evidentiary hearings concerning Mr. Young's application.

121.   At the same time, Petty was being paid by Judge Moore for his law-clerk services.

122.   Following the evidentiary hearings, Petty submitted to Judge Moore a "suggested order" dismissing each of Mr. Young's claims.

123.   Judge Moore adopted Petty's order verbatim, dismissing Mr. Young's application in its entirety.

124.   Relying on that order—written by Petty and signed by Judge Moore—the CCA also denied Mr. Young the relief from death that he sought.

125.   The State subsequently filed its motion for a warrant of execution against Mr. Young (Ex. D).  Although this motion was signed by DA Nodolf, it bears Petty's distinctive styling and formatting, which DA Nodolf has confirmed she does not use.

126.   In support of the State's motion for a warrant of execution, Petty filed a 150-page "summary of the evidence" on behalf of the State, even though such pleading is neither required nor typical.

127.    Judge Moore granted the State's motion for execution.  That Order (Ex. E) likewise bears Petty's distinctive formatting and style.

128.    It was not until 2019, after DA Nodolf disclosed Petty's dual employment— a fact that both the District Attorney's Office and the Court had been aware of and endorsed throughout all proceedings related to Mr. Young—that the Midland County District Attorney's Office recused itself from Mr. Young's case.

129.    Mr. Young presented this evidence to Judge Harle, arguing that Petty's previously undisclosed conflict of interest resulted in a structural error that denied Mr. Young his constitutional right to due process.

130.    Following an evidentiary hearing, the 385th District Court of Midland County found that Petty, while a prosecutor for the County, engaged in *ex parte* communications with District Judges, which contributed to rulings favorable to the prosecution.

131.    A true and correct copy of the court's decision is attached as Exhibit L.

132.    The court further found that Schorre and Clingman knew about Petty's conflict of interest and failed to disclose it.

133.    Based on these findings, the court held that Mr. Young's "federal and state due process rights were violated by . . . both the trial court's use of prosecutor Ralph Petty's services as a paid law clerk during Mr. Young's trial . . . and the prosecution's

withholding of that arrangement, which prevented Mr. Young from moving to recuse or disqualify the trial judge and/or the Midland DA."

134.    The court explained, in part, that "[e]x parte contact between a party and the trial judge violates due process because it erodes the appearance of impartiality and jeopardized the fairness of the proceeding."

135.    Based on its findings of fact and conclusions of law, the court recommended that Mr. Young's conviction be vacated.

136.    In September 2021, the CCA unanimously agreed with the district court. *Ex parte Young*, No. WR-65137-05, 2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) (unpublished).  Vacating Mr. Young's conviction, the CCA held that:

> Judicial and prosecutorial misconduct—in the form of an undisclosed employment relationship between the trial judge and the prosecutor appearing before him—tainted Applicant's entire proceeding from the outset.  As a result, little confidence can be placed in the fairness of the proceedings or the outcome of Applicant's trial. . . .  The evidence present in the case supports only one legal conclusion: that Applicant was deprived of his due process rights to a fair trial and an impartial judge.

137.    The CCA issued the mandate on its ruling on October 19, 2021.

**Mr. Young should not have had to endure death row.**

138.    Without the unconstitutional judicial and prosecutorial misconduct found by the CCA, Mr. Young would not have spent nearly twenty years fighting for his life on death row.

139.    While any unlawful constraint on a person's liberty is intolerable, the conditions of death row are particularly unconscionable.

140.    In Texas, men placed on death row are mandatorily and indefinitely placed in solitary confinement.

141.    As such, Mr. Young was in solitary confinement, in an eight-by-twelve-foot cell, from April 11, 2003 until October 29, 2021.

142.    In solitary confinement, individuals are only permitted two hours a day outside of their cell, and only five days a week.

143.    For nearly two decades, Mr. Young spent between twenty-two and twenty-four hours of each day inside a solitary prison cell.

144.    During Covid-19, recreation time came to a halt, leaving Mr. Young in his cell twenty-four hours day, every day, for months on end.

145.    Before 2022, individuals on death row were not permitted to make phone calls, except for one five-minute phone call every ninety days to an approved person.

146.    For nearly twenty years, Mr. Young sat in solitary confinement without the opportunity to connect with his loved ones by phone.

147.    Individuals on death row must be escorted to the shower by prison staff, meaning showers only occur when there is sufficient staff on duty.

148.    There were many days over the course of two decades that Mr. Young was not even permitted to bathe.

27

149.    Individuals on death row cannot leave their cell without being handcuffed and/or shackled.

150.    For nearly twenty years, Mr. Young did not step foot out of his solitary prison cell without chains around his wrists and/or ankles.

151.    Individuals on death row cannot have contact visits, meaning all visitation occurs behind glass, with the incarcerated individual held in a cell smaller than the average person's wingspan in each direction—approximately nine square feet.  Visitors and prisoners must talk through phones hanging on the wall.

152.    Mr. Young did not have any physical contact with another individual, except for being shackled by prison guards and the occasional doctor's visit, for nearly two decades.

153.    Even when individuals on death row do have visits, they are limited to one two-hour visit per week, which requires significant advance planning and permission.

154.    The Polunsky Unit of the Texas correctional system, where those on death row are housed, is in rural Texas, approximately seventy-five miles from Houston, and is not readily accessible for most people.

155.    For almost two decades, Mr. Young was not permitted to see a friend or loved one for more than two hours once a week, with the meeting occurring from behind glass and over the phone.  In reality, Mr. Young rarely had visitors, due in large part to

the administrative complications of scheduling such visits and the remote location of the Polunsky Unit.

156.    Even though all visits are conducted from behind glass and those on death row are confined to small cells during their visits, individuals on death row are subjected to strip searches every time they leave the death row building.

157.    For nearly twenty years, every time Mr. Young left the death row building, including every time he had a visitor, he was subjected to a strip search.

158.    In addition to being sentenced to death, Mr. Young was also ordered to pay Midland County for the costs of his prosecution, including the fees for his court-appointed attorneys and appeals.  As of November 25, 2021, Mr. Young was indebted to Midland County for $296,056.91.

159.    The government enforced its Bill of Costs by removing 10% of all money in Mr. Young's inmate trust fund account each month, limiting Mr. Young's ability to purchase basic necessities—or the few remaining simple pleasures available for purchase—while serving his death row sentence.

160.    The living conditions on death row in Texas are currently the subject of a lawsuit, alleging that these conditions violate death row prisoners' constitutional and statutory rights, including their Eighth Amendment right to be free from cruel and unusual punishment under the U.S. Constitution, their Art. I § 13 right to be free from cruel and unusual punishment under the Texas Constitution, their Fourteenth

Amendment right to due process under the U.S. Constitution, and their right to counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and 18 U.S.C. § 3599. *See generally* Original Complaint, *Robertson v. Collier*, 4:23-cv-283 (S.D. Tex. Jan. 26, 2023), ECF No. 1.

161.    From 2003 until 2021, Mr. Young was subjected to these unconstitutional and statutorily prohibited conditions because of the unconstitutional actions of the Defendants described herein.

**Since the vacatur of Mr. Young's conviction, Mr. Young has proven his reliability and contributed to the general welfare of society, despite the State's continued efforts to deprive him of life and liberty.**

162.    Although the CCA vacated Mr. Young's conviction on September 22, 2021, Mr. Young was not released from death row until October 29, 2021.

163.    After his release from death row, Mr. Young was transferred back to the Midland County Jail, where he was held in solitary confinement and denied phone privileges with counsel of his choosing, despite repeated assurances that Mr. Young would be transitioned into general population and given the ability to communicate with his chosen counsel.

164.    On January 19, 2022, Judge Harle set bail at $150,000.  Mr. Young's loved ones were immediately prepared to pay the bail amount and retrieve Mr. Young under the conditions that Judge Harle ordered, including GPS monitoring.

165.    Despite this order from Judge Harle, Judge Leah Robertson of the 385th District Court instructed the bailiff and Midland Pretrial Services to not release Mr. Young from custody, preventing Mr. Young's loved ones from posting bail.

166.    Judge Robertson worked with Mr. Petty as a Midland County ADA from 2007 to 2012.

167.    Due to Judge Robertson's instructions, Mr. Young's loved ones could not post bail until after Judge Harle was alerted to Judge Robertson's misconduct and intervened.

168.    Because of Judge Robertson's *ultra vires* instructions, Mr. Young was unconstitutionally, unlawfully, and wantonly detained for hours, in violation of his Fourth Amendment right against unconstitutional seizures.

169.    Since his release, Mr. Young has proven his responsibility and compliance with all court orders as the court gradually loosened Mr. Young's conditions of release.

170.    Since August 2022, Mr. Young has been gainfully employed with an oil-field service company as a pump operator.

171.    By November 9, 2022, Mr. Young was no longer required to wear an ankle monitor.  Judge Harle determined that Mr. Young could be trusted to move about freely within a set perimeter and that he could travel for work.

172.    Mr. Young has complied with every condition of his release.

173.    Mr. Young spends his free time with his friends and family, taking advantage of every opportunity to see his young nephews and make up for the decades he lost behind bars.

174.    Mr. Young maintains an active role in the organization he helped found while sitting on death row—The Clinton Young Foundation—to provide legal representation to others who have been wrongfully convicted.

175.    Despite Mr. Young's full compliance with all court orders, the fact that he has been deemed fit to move about without even an ankle monitor, and all of the evidence pointing to Page as the true murderer of Mr. Douglas and Mr. Petrey, the State of Texas is still pursuing the death penalty against Mr. Young as of the filing of this Complaint.

176.    Even in the face of this adversity and injustice, Mr. Young continues to show up for work, for his family and friends, and for himself.

177.    The unconstitutional acts of the Defendants described herein demand remediation.

**<u>Injury to Plaintiff</u>**

178.   By denying Mr. Young his right to due process, the Defendants have directly and proximately caused him severe harms, including but not limited to:

    a.   **Financial Harms**:

        i.   The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, inhibiting his earning capacity for two decades.

        ii.   The Defendants' actions caused Mr. Young to spend nearly twenty years on death row, and, in turn, in solitary confinement, impeding his educational opportunities and severely diminishing his future earning capacity.

        iii.   The Defendants' actions caused Mr. Young to spend nearly twenty years on death row, and in turn, in solitary confinement, preventing him from engaging in any prison work programs.

        iv.   The Defendants' actions caused Mr. Young to be convicted of capital murder, limiting his ability to obtain gainful employment due to employers' hesitation against hiring individuals with such a record.

        v.   The Defendants' actions caused Mr. Young to have money deducted from his commissary to pay for the costs of his criminal proceedings,

even though those proceedings were irremediably tainted by the Defendants' unconstitutional conduct.

vi. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, causing him to expend significant resources on postal mailings, the primary form of communication available to death-row prisoners.

vii. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, causing him to expend significant resources on medical fees for health concerns caused by the conditions of his confinement.

viii. The Defendants' actions required Mr. Young to expend significant money on attorney fees and court costs related to his criminal defense at trial and postconviction.

b. **Physical Harms**:

i. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, negatively affecting his overall physical health and his expected life span.

ii. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, exposing

him to severe mold and uncleanliness and causing persistent respiratory complications.

iii. The Defendants' actions have caused Mr. Young to suffer persistent, ongoing wrist, shoulder, back, and elbow pain due to the conditions of confinement, including the constant use of constraints.

c. **Societal Harms**:

i. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, where prisoners are prohibited from making phone calls, preventing him from developing meaningful interpersonal relationships.

ii. The Defendants' actions caused Mr. Young to sit on death row and, in turn, in solitary confinement for nearly twenty years, incarcerating him from ages eighteen to thirty-eight and preventing him from developing romantic or sexually intimate relationships.

iii. The Defendants' actions caused Mr. Young to sit on death row and, in turn, in solitary confinement for nearly twenty years, incarcerating him from ages eighteen to thirty-eight and limiting his opportunities to build a family and experience parenthood.

iv. The Defendants' actions caused Mr. Young to be convicted of capital murder and spend nearly twenty years on death row and, in turn,

in solitary confinement, inhibiting his ability to develop future relationships due to the stigmas surrounding those with such a record.

d. **Mental and Emotional Harms**:

    i. The Defendants' actions caused Mr. Young to come within eight days of being executed by the State of Texas, causing immeasurable stress, depression, and anxiety.

    ii. The Defendants' actions caused Mr. Young to live on death row and, in turn, in solitary confinement from age twenty to age thirty-eight, depriving him of the emotional development and maturation experiences and processes that are necessary to adult development.

    iii. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, resulting in an overall decline in his mental and emotional health.

    iv. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, where Mr. Young was subjected to regular strip searches, causing deep humiliation and stress.

    v. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, where Mr.

Young could not leave his cell without being handcuffed, chained, and/or shackled, causing deep humiliation and stress.

vi. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, causing long-term mental health complications, such as Post Traumatic Stress Disorder, depression, and anxiety.

vii. The Defendants' actions caused Mr. Young to spend nearly twenty years on death row and, in turn, in solitary confinement, preventing him from participating in prison work programs and depriving him of a sense of self-worth and purpose.

e. **Reputational Harms**: The Defendants' actions have wrongly labeled Mr. Young a murderer, leaving a stain that can never be removed even though Mr. Young's conviction has been reversed.

f. **Access to Justice Harms**:

i. The Defendants' actions have caused Mr. Young to lose faith in the criminal justice system in Texas, a place he calls home.

ii. The Defendants' actions have forced Mr. Young to endure and expend significant time and costs caused by an unconstitutional process.

37

**Causes of Action**

**Count I**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Due Process Claim Against Midland County)**

179.    Mr. Young realleges and incorporates the allegations in Paragraphs 1 through 178 of this complaint as if fully stated herein.

180.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

181.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

182.    An employment relationship between a judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge related to his own cases and cases in which his employer is a party, deprives defendants of due process.

183.    An employment relationship between a judge and prosecutor, particularly where the purpose of employment is to provide legal advice and draft legal decisions, creates an appearance that the judge is partial to the prosecutor and his views of the law, depriving defendants of due process.

184.    Through its policymakers, Midland County adopted and enforced an official employment policy or custom of permitting a prosecutor to work as a law clerk to

the judges he practiced before, both on cases he was personally prosecuting and on cases in which his employer was a party.

185.    Through its policymakers, Midland County also adopted and enforced an official policy or custom of concealing the fact that one of its prosecutors worked as a law clerk to the judges he practiced before, both on cases he was personally prosecuting and on cases in which his employer was a party.

186.    With Midland County's policymakers' knowledge and consent, Petty worked as Judge Hyde's law clerk on Mr. Young's criminal trial while simultaneously working for the District Attorney's Office as one of the prosecutors on Mr. Young's criminal trial.

187.    With Midland County's policymakers' knowledge and consent, Petty worked as Judge Hyde's and Judge Moore's law clerk while simultaneously working for the District Attorney's Office as the lead prosecutor opposing Mr. Young's habeas petitions.

188.    This dual role violated due process by depriving Mr. Young of criminal proceedings free from either actual or perceived bias.

189.    Petty was not in fact, or did not have the appearance of, a neutral law clerk without a personal stake in the outcome of Mr. Young's case. As an ADA, he had either an actual or perceived interest in ensuring that disputes and cases were resolved in the prosecution's favor.

190.    Further, Petty's role as a law clerk allowed Petty to engage in *ex parte* communications with Judge Hyde and Judge Moore and gave him access to defense documents generally unavailable to prosecutors, compromising the fairness of Mr. Young's criminal proceedings.

191.    In his role as a law clerk to Judges Hyde and Moore in Mr. Young's case, Petty engaged in *ex parte* communications with Judges Hyde and Moore concerning Mr. Young's case, eroding the appearance of impartiality and jeopardizing the fairness of the proceedings.

192.    The average law clerk in Petty's position would not be able to view both the defense and prosecution equally in light of their primary employment as an ADA.

193.    Judge Hyde and Judge Moore had an existing, ongoing employment relationship with Petty, who, as an ADA for Midland County, represented the opposing party in Mr. Young's case.

194.    The purpose of Petty's employment relationship with Judges Hyde and Moore was to provide these judges with legal opinions and to draft their legal decisions.

195.    The average judge in Judge Hyde's and Judge Moore's position would not be able to view both the prosecution and defense equally in light of this relationship.

196.    Judge Hyde was not in fact, or did not have the appearance of, a neutral adjudicator without a personal stake in the outcome of Mr. Young's case. Because of his

personal relationship with Petty, made possible by the County's policy, he had either an actual or perceived interest in ruling in favor of the prosecution.

197.    Judge Moore was not in fact, or did not have the appearance of, a neutral adjudicator without a personal stake in the outcome of Mr. Young's case. Because of his personal relationship with Petty, made possible by the County's policy, he had either an actual or perceived interest in ruling in favor of the prosecution.

198.    Petty's arrangement as both a law clerk and ADA was not merely a one-time occurrence, but it lasted for nearly twenty years, was approved of by the County Attorney, was endorsed by multiple District Attorneys, was signed off on by County Treasurer Jo Ann Carr, and was even reported to the IRS as part of the County's operations and budgets.

199.    The actions of Petty, Schorre, Clingman, County Attorney Malm, and County Treasurer Carr are attributable to the County. As final policymakers with decision-making authority, these individuals made a deliberate employment decision to allow a prosecutor to work from both sides of the bench and taint the impartiality of every proceeding where Petty served as either a law clerk or a prosecutor—or both.

200.    The actions of Petty, Schorre, Clingman, County Attorney Malm, and County Treasurer Carr are attributable to the County. As final policymakers with decision-making authority, these individuals repeatedly made a deliberate decision to permit Petty's dual role and conceal that dual role from defendants.

201.    In the alternative, if policymakers for the County did not make the decision allowing Petty to serve in a dual role, violating due process, then they failed to oversee Petty in acting as both a prosecutor and a law clerk.  Schorre and Clingman knew that Petty worked for District Judges, as did County Attorney Malm.  County Treasurer Carr was responsible for paying Petty for both roles, reporting all income to the IRS, and providing Petty with W-2s for his role as a prosecutor and Form 1099s for his role as a law clerk.  And Clingman expressly reported Petty's dual role to the IRS in official federal filings.

202.    As an ADA, Petty was a municipal policymaker, and his employment decisions and actions described in this Complaint represent official Midland County policy.

203.    As a DA and First ADA, Clingman was a municipal policymaker, and her employment decisions and actions described in this Complaint represent official Midland County policy.

204.    As a DA, Schorre was a municipal policymaker, and his employment decisions and actions described in this Complaint represent official Midland County policy.

205.    As County Attorney, Russell Malm was a municipal policymaker, and his decisions and actions described in this Complaint represent official Midland County policy.

206.    As County Treasurer, Jo Ann Carr was a municipal policymaker, and her decisions and actions described in this complaint represent official Midland County policy.

207.    Endorsement of Petty's dual role, and the decision to not disclose the same to defendants, was the County's official policy or custom, violating due process.

208.    Mr. Young's capital murder conviction resulted from criminal proceedings tainted by this structural due process violation, causing the harms outlined in Paragraph 178.

### Count II
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Due Process Claim Against Petty)

209.    Mr. Young realleges and incorporates the allegations in Paragraphs 1 through 178 of this complaint as if fully stated herein.

210.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

211.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

212.    Due process further requires prosecutors to protect defendants' due process rights, including disclosing exculpatory evidence and conflicts of interest.

213.    An employment relationship between a judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge related to his own cases and cases in which his employer is a party, deprives defendants of due process.

214.    An employment relationship between a judge and prosecutor, particularly where the purpose of employment is to provide legal advice and draft legal decisions, creates an appearance that the judge is partial to the prosecutor and his views of the law, depriving defendants of due process.

215.    Petty worked as a law clerk on Mr. Young's criminal case—both at the trial level and during habeas proceedings—while also working as a prosecutor for the District Attorney's Office on Mr. Young's criminal case, which is a blatant, clearly established violation of due process.

216.    In his role as a law clerk on Mr. Young's case, Petty engaged in *ex parte* communications with Judge Hyde and Judge Moore, advised them on a case he and his employer were actively prosecuting, and drafted orders and judgments that Judges Hyde and Moore signed.  At the same time, Petty appeared as a prosecutor in Mr. Young's case and advised his fellow prosecutors on case strategy and matters of law.  This employment relationship and dual role were not disclosed to Mr. Young or his counsel until 2019.

217.    Petty's dual role violated due process by depriving Mr. Young of criminal proceedings free from either actual or perceived bias.

218.     Petty was not in fact, or did not have the appearance of, a neutral law clerk without a personal stake in the outcome of Mr. Young's case.  As an ADA, he had either an actual or perceived interest in ensuring that disputes were resolved in the prosecution's favor.

219.     Further, Petty's role as a law clerk gave Petty access to defense documents generally unavailable to prosecutors, compromising the fairness of Mr. Young's criminal proceedings.

220.     In his role as a law clerk to Judge Hyde and Judge Moore in Mr. Young's case, Petty engaged in *ex parte* communications with Judge Hyde and Judge Moore concerning Mr. Young's case, eroding the appearance of impartiality and jeopardizing the fairness of proceedings.

221.     The average law clerk in Petty's position would not be able to view the defense and prosecution equally in light of their primary employment as an ADA.

222.     Mr. Young's capital murder conviction resulted from criminal proceedings tainted by this structural due process violation, causing the harms outlined in Paragraph 178.

**Count III**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Due Process Claim Against Schorre)**

223.    Mr. Young realleges and incorporates the allegations in Paragraphs 1 through 178 of this complaint as if fully stated herein.

224.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

225.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

226.    Due process further requires prosecutors to protect defendants' due process rights, including disclosing exculpatory evidence and conflicts of interest.

227.    An employment relationship between a judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge related to his own cases and cases in which his employer is a party, deprives defendants of due process.

228.    An employment relationship between a judge and prosecutor, particularly where the purpose of employment is to provide legal advice and draft legal decisions, creates an appearance that the judge is partial to the prosecutor and his views of the law, depriving defendants of due process.

229.    Schorre hired Petty as an ADA knowing about his employment relationship with the District Judges, including Judge Hyde.

46

230.    Schorre expressly endorsed Petty's employment relationship with the District Judges.

231.    As DA, Schorre benefited from Petty's employment relationship with the District Judges, which enabled Petty to have *ex parte* communications with the District Judges, gain access to information unavailable to the defense, and draft orders and rulings in the prosecution's favor.

232.    Schorre's decision to hire Petty as an ADA while knowing about—and endorsing—his employment with the District Judges violated due process.

233.    As outlined in Counts I and II, Petty's dual role compromised the neutrality of Mr. Young's criminal proceedings.  Even though Schorre knew that Petty was working as a law clerk for Judge Hyde—and even knew or should have known Petty was working as a law clerk for Judge Hyde *on Mr. Young's case*—he assigned Petty to work as a prosecutor on Mr. Young's case before Judge Hyde.  This is a blatant, clearly established violation of due process.

234.    Mr. Young's capital murder conviction resulted from criminal proceedings tainted by this structural due process violation, causing the harms outlined in Paragraph 178.

**Count IV**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Due Process Claim Against Clingman)**

235.    Mr. Young realleges and incorporates the allegations in Paragraphs 1 through 178 of this complaint as if fully stated herein.

236.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires a fair trial in a fair, impartial tribunal.

237.    The right to a fair tribunal not only requires that the judge and law clerk be impartial in fact, but it also requires that trial proceedings avoid even the appearance of partiality.

238.    Due process further requires prosecutors to protect defendants' due process rights, including disclosing exculpatory evidence and conflicts of interest.

239.    An employment relationship between a judge and prosecutor, which enables the prosecutor to engage in *ex parte* communications with the judge related to his own cases and cases in which his employer is a party, deprives defendants of due process.

240.    An employment relationship between a judge and prosecutor, particularly where the purpose of employment is to provide legal advice and draft legal decisions, creates an appearance that the judge is partial to the prosecutor and his views of the law, depriving defendants of due process.

241.    As the First ADA and a lead prosecutor in Mr. Young's criminal trial, Clingman staffed Petty as an ADA on Mr. Young's case while also knowing about Petty's employment relationship with the District Judges, including Judge Hyde.

242.    As the First ADA and the lead prosecutor in Mr. Young's criminal trial, Clingman knowingly gained an advantage for the prosecution because of Petty's employment relationship with Judge Hyde.

243.    As DA, Clingman continued to allow Petty to have a dual role as an ADA and as a law clerk to the District Judges.

244.    As DA, Clingman benefited from Petty's employment relationship with the District Judges, which enabled Petty to have *ex parte* communications with the District Judges, gain access to information unavailable to the defense, and draft orders and rulings in the prosecution's favor.

245.    As DA, Clingman staffed Petty as the prosecutor responsible for opposing Mr. Young's habeas petitions before Judges Hyde and Moore, while also knowing that Mr. Young served as a law clerk to Judges Hyde and Moore and provided legal advice and drafted legal opinions for Judges Hyde and Moore resolving habeas petitions.

246.    Clingman's decision to staff Petty as an ADA on Clint's criminal proceedings while knowing about his employment with the District Judges violated due process.

247.     Clingman's decision to permit Petty to continue in his dual employment with the District Attorney's Office and the District Judges violated due process.

248.     As outlined in Counts I and II, Petty's dual role compromised the neutrality of Mr. Young's criminal proceedings. Even though Clingman knew that Petty was working as a law clerk for Judge Hyde and Judge Moore—and even knew or should have known Petty was working as a law clerk for Judge Hyde *on Mr. Young's case*—she assigned Petty to work as a prosecutor on Mr. Young's case before Judge Hyde and Judge Moore.  This is a blatant, clearly established violation of due process.

249.     Mr. Young's capital murder conviction resulted from criminal proceedings tainted by this structural due process violation, causing the harms outlined in Paragraph 178.

### Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment: (1) declaring that the Defendants violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution; and (2) awarding him compensatory and punitive money damages against Midland County, Weldon "Ralph" Petty, Jr., Albert Schorre, Jr., and Teresa Clingman.  Plaintiff also seeks his attorney fees and costs under 42 U.S.C. § 1988, as well as all other further relief as the Court may deem just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal

Rules of Civil Procedure.


Dated: September 19, 2023                    Respectfully submitted,

                                             /s/ Merel Pontier
                                             Merel Pontier (TX Bar No. 24121061)
                                             CLINTON YOUNG FOUNDATION
                                             P.O. Box 201493
                                             Austin, Texas 78720
                                             Tel.: (737) 615-2333
                                             Email: mpontier@clintonyoungfoundation.com

                                             Alexa L. Gervasi*
                                             Turahn L. Jenkins*
                                             KRAUS JENKINS, PLLC
                                             1001 Liberty Ave.
                                             Pittsburgh, PA 15222
                                             Tel.: (412) 546-0780
                                             Email: agervasi@krausjenkins.com
                                                     tjenkins@krausjenkins.com

                                             *Attorneys for Plaintiff, Mr. Clinton Young*

                                             *Motions   for   Admission   *Pro   Hac   Vice*
                                             forthcoming